In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-3495

WILLIAM T. DIVANE JR., *et al.*,

*Plaintiffs-Appellees*,

*v.*

KRULL ELECTRIC CO.,

*Defendant*,

and

JOHN J. CURRY JR.,

*Respondent-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 C 6108—**George W. Lindberg**, *Judge.*

ARGUED SEPTEMBER 24, 2002—DECIDED FEBRUARY 11, 2003

Before BAUER, POSNER, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Three years ago, we upheld the district court's imposition of Rule 11 sanctions against John J. Curry Jr. for filing an answer and counterclaim that (i) denied certain facts that Curry's client, Krull Electric Company, previously had admitted in companion litigation and (ii) asserted a frivolous counterclaim for which Curry never provided any evidentiary support, despite the frequent opportunities to do so during the

underlying litigation's "tortuous three-year road to trial." *Divane v. Krull Electric Co., Inc.*, 200 F.3d 1020, 1022 (7th Cir. 1999) [hereinafter *Divane I*]. We remanded the case to the district court to determine the appropriate amount of sanctions, vacating the district court's initial blanket award of attorney's fees and costs because it necessarily included some amount that did not directly result from Curry's sanctionable conduct. *Id.* Dissatisfied with the district court's decision on remand, Curry appeals the sanction award once again, arguing this time that the district court abused its discretion by ignoring certain elements of our mandate and disregarding governing principles in fashioning an appropriate award. Because the district court acted within its discretion in reducing the amount of the original sanction award by a figure representing a reasonable estimate of what the plaintiffs' attorney's fees and costs would have been absent Curry's sanctionable conduct, we affirm.

## HISTORY

The sanctions were imposed in a case that began in October 1995, when plaintiffs-appellees William T. Divane Jr., et al., known collectively as the Electrical Insurance Trustees, filed a complaint against defendant Krull Electric Company claiming that the defendant owed them delinquent benefit-fund contributions under the terms of a collective bargaining agreement ("CBA"). For ease of later explanation, we will refer to this case as *Krull Electric II*. Specifically, in *Krull Electric II*, the Trustees alleged that Krull Electric was an electrical employer employing electricians pursuant to an October 1984 letter of assent that Krull Electric had executed to a CBA originally entered into between Local 134 of the International Brotherhood of Electrical Workers and the Electrical Contractors' Association of the City of Chicago. Under the terms of the CBA, Krull Electric (as an employer) agreed

to pay certain wages and to file a monthly payroll report and make corresponding monthly contributions to the Trustees (as the duly appointed representatives of Local 134 and the Association) to cover certain fringe benefits for Krull Electric's employees. The Trustees alleged that Tan Lee—an electrician employed by Krull Electric and husband of its president, Pamela Lee—had testified in a September 1995 deposition (taken in a related case, which is explained below) that he had been working forty hours a week for the company. This was news to the Trustees; Krull Electric had stopped making contributions in October 1994, filing monthly payroll reports that claimed that no contributions were due because no "clock hours" had been logged by any of its electricians. Citing provisions of the CBA and its related agreements, which granted the Trustees the power to demand and collect delinquent contributions on the Fund's behalf, the Trustees brought suit under ERISA and the Labor Management Relations Act to recover the delinquent funds.

Krull Electric denied liability, claiming it had no payment obligation because it was no longer a signatory to the CBA, and filed a counterclaim alleging that the Trustees' demand for payment constituted a violation of section 302 of the LMRA. 29 U.S.C. § 186 *et seq.* (1995) (prohibiting the collection of payments without the requisite provisions of services or benefits). In its answer, Krull Electric denied knowledge of various CBA and related-agreement provisions, denied knowledge that Tan Lee had testified to working forty hours a week, and although it admitted that it had not made any fringe-benefit contributions since October 1994, denied that it had any obligation to make them. It asserted four affirmative defenses: (1) that it was not bound by any agreement to pay benefit-fund contributions; (2) that the Trustees suffered no loss; (3) that the amounts claimed by the Trustees were excessive; and (4) that the Trustees' demands for payment were unlawful. In its corresponding single-count counterclaim,

Krull Electric explained why it was no longer obligated to make benefit-fund contributions despite its October 1984 assent to the CBA: Krull Electric alleged that in October 1994, Local 134 determined that the company was no longer a signatory of the CBA. And since the Trustees knew (or should have known) of Local 134's determination, their demand to compel payment violated the LMRA.

Krull Electric's denials and counterclaim allegations frustrated and confused the Trustees. First, the denials directly contradicted admissions the company had made just months earlier in response to another, related complaint the Trustees had filed against Krull Electric. In that case, which had been pending before Judge Kocoras since April 1995, the Trustees claimed that Krull Electric had been underreporting the amount of hours Tan Lee had worked each week for the years 1992 and 1993 in order to minimize the amount of fringe-benefit contributions the company was responsible for making under the CBA. Since it was filed first (even though it is discussed second here), we will call this case *Krull Electric I*. The Trustees' *Krull Electric I* complaint had set forth some of the same CBA and related-agreement provisions that were alleged in *Krull Electric II*. But in its *Krull Electric I* answer, the company had admitted knowledge of these provisions and to being a signatory to the agreement. (Tellingly, Krull Electric filed a motion on May 15, 1996—five days after filing its answer in *Krull Electric II*—seeking to amend its *Krull Electric I* answer in order to remove its admissions regarding its knowledge of the CBA provisions and to refute its status as a signatory. Judge Kocoras denied the motion.) Second, it was in the course of discovery for *Krull Electric I* that Tan Lee's deposition had been taken, revealing the post-October 1994 hours worked that formed the core of the Trustees' cause of action in *Krull Electric II*. And as such, the Trustees were perplexed over how Krull Electric—who, as a party

in *Krull Electric I,* attended the Tan Lee deposition and was entitled to the same copy of the deposition transcript that the Trustees had received—could credibly claim lack of knowledge over what Tan Lee had testified to. Finally, at Pamela Lee's deposition on May 24, 1996, the Trustees inquired into the factual underpinnings of the counterclaim: namely, the alleged Local 134 determination. Over objections by Curry, Pamela claimed she didn't know what Local 134 might have done in October 1994 and, strangely, that if she did, the information about it was privileged. After the deposition, the Trustees informed Curry that if he could not provide support for Krull Electric's counterclaim allegations, they would seek sanctions.

Curry never did. He deposed several Local 134 members, but never was able to drum up any support for the notion that the union had repudiated its agreement with Krull Electric. So on September 13, 1996, the Trustees sent Curry a motion requesting that he withdraw the counterclaim and amend his answer by October 4, 1996, or face sanctions. Judge Lindberg denied the motion to strike, noting that by alleging the October 1994 repudiation by Local 134, Krull Electric had raised an issue of fact. But the court warned Curry that if he could not substantiate his claim, he would face sanctions. Discovery concluded, and the case went to bench trial in December 1997. In his trial brief, Curry advanced a couple of new arguments as to why the company was not obligated to pay contributions as required by the CBA. Finding these last-minute arguments as equally unsupported by the evidence as the October 1994 repudiation allegation, the district court found in favor of the Trustees and awarded just over $54,000 in damages.

In post-trial proceedings, the Trustees renewed their Rule 11 motion, requesting the court to award $25,000 as a flat sanction. Simultaneously, they filed a fee petition against Krull Electric under ERISA's fee-shifting provision.

In a March 27, 1998 order addressing both motions, the district court first found Curry's conduct sanctionable, observing that the answer and counterclaim had been filed without any evidentiary support (or reasonable inquiry) and were intended for the improper purposes of incurring unnecessary delay and needlessly increasing the costs of litigation. As such, Curry's sanctionable conduct had infected the entire proceeding, pressing an otherwise straightforward, routine, and, for that matter, meritorious case (because, after all, Krull Electric never was able to produce any viable defense to the Trustees' claim) all the way to trial, imposing en route undue burdens on the Trustees and the court. As a sanction, the district court ordered Curry to pay a $5000 penalty to the court, and, should Krull Electric not be able to satisfy its judgments, to pay the roughly $37,645 in attorney's fees and $2526.07 in costs prayed for by the Trustees in their ERISA fee petition—reasoning that the practical effect (and perhaps targeted goal) of Curry's obstructionism was the avoidance of any realistic possibility of the Trustees' recovery from Krull Electric, which had by then claimed insolvency and seemed likely to enter bankruptcy proceedings. In setting the amount of the fee award, the district court considered and rejected Krull Electric's numerous objections to the Trustees' fee petition, including claims that the Trustees' attorney's billing rates were unreasonable and the time requested was excessive.

Dissatisfied, Curry filed a Rule 59(e) motion seeking to alter or amend the court's sanction award, essentially repeating the arguments he advanced in opposition to the Trustees' Rule 11 motion and fee petition the first time. In an April 16, 1998 order, the district court refused to address the only new argument Curry advanced— that the court had in fact already stricken the counterclaim back in June 1996—because that argument was available to Curry at the time he filed his original response. But the court did proceed to modify the judgment. Having

determined that circumstances now made clear that Krull Electric would not be able to satisfy the judgments entered against it, the court dispensed with contingencies altogether and ordered Curry to pay the Trustees all attorney's fees and expenses incurred after May 10, 1996—the date of the offensive pleading—a total of $33,292 in fees and $2306.69 in costs. In the court's opinion, this amount was an appropriate sanction for Curry's conduct and was warranted for effective deterrence.

On appeal, we upheld the district court's imposition of Rule 11 sanctions against Curry, rejecting his procedural and substantive challenges. *Divane I*, 200 F.3d at 1022. But in evaluating the fee-based sanction in light of the Rule's mandate in subsection (c)(2) that sanctions be limited to the least amount sufficient to deter repetitious conduct and—that being so—that an award of reasonable attorney's fees and other expenses be limited to those directly resulting from the sanctionable conduct, we could not accept that all of the awarded legal expenses were warranted. *Id.* at 1030; *see also* Fed. R. Civ. P. 11(c)(2). We remanded the case so that the district court could set a more appropriate amount, noting that it was in the best position to determine which of the Trustees' legal costs were the direct result of the sanctionable conduct. *Id.*

In remanding, we added a "cautionary note" to the district court, which explained that a proper award would include, for example, any research into the sole legal issue raised by Curry's counterclaim, but that it could not include such activities as the cost of deposing witnesses who would have been deposed without regard to the frivolous counterclaim. *Id.* at 1031. Moreover, we observed that we could see no reason why the sanctionable denials in the answer would cause the Trustees to incur additional legal expenses since those denials were di-

rectly at odds with admissions made in companion litigation. *Id.*

On remand, Curry seized upon our cautionary language as an explicit endorsement that the district court evaluate each specific line-item entry in the fee petition in setting the appropriate award. Moreover, he read our language questioning whether any additional fees could result from contesting denials in an answer that had been admitted elsewhere to mean that we had conclusively held unrecoverable any fees claimed to have resulted from the sanctionable answer. As this left only the sanctionable counterclaim, he scoured the fee petition objecting to any line-item entry that did not specifically reference it and it alone. As a result, he struck all but two entries, which totaled $334 in fees. Apart from his objections, Curry advocated for a period of discovery during which he could depose the Trustees' counsel and gain access to their individual timesheets, which in his opinion were the only evidence of contemporaneous timekeeping capable of clarifying the pre-billing reports and conclusively establishing the time spent addressing his sanctionable conduct. He demanded that at the conclusion of this additional discovery the court hold an evidentiary hearing before ruling on an appropriate award.

Viewing his latest procedural requests against the protracted procedural history of this case and its related proceedings, the Trustees argued in response that granting the request for additional discovery and an evidentiary hearing would do nothing more than create another battlefield for Curry's war of attrition, one that the court need not endorse or participate in. In any event, they asserted that their pre-billing time descriptions were adequate and that discovery of individual timesheets wouldn't aid the district court in its analysis. The difficulty in separating recoverable from nonrecoverable fees was not—as Curry asserted—due to insufficient time-record-

ing procedures or a failure to satisfy the Trustees' burden to substantiate their fee request, but was instead a byproduct of Curry's sanctionable conduct. The denial that Krull Electric was no longer bound by the terms of the CBA (an argument up until trial based solely on the counterclaim allegations) so pervaded discovery and the pretrial proceedings that the Trustees were unable to separate by individual time entry that time spent litigating against the counterclaim from that time spent prosecuting their own case. To illustrate, they responded to many of Curry's objections to their individual time entries on the pre-billing report, setting forth how each challenged entry directly related to Curry's sanctionable conduct. Moreover, they argued that Krull Electric's only practical defense to the action was to delay the course of the litigation, which Curry accomplished by asserting the baseless counterclaim and obstructionist answer. Absent this sanctionable conduct, the Trustees argued that the company would, at the least, have been forced into favorable settlement terms since Krull Electric had no viable defenses to the Trustees' claims (as born out by the meritless arguments asserted in its last-minute trial brief). But because of the time the Trustees spent battling against Curry's stonewalling tactics, Krull Electric was essentially allowed to liquidate its assets, preventing any meaningful recovery by the Trustees. Thus, the Trustees stood by their claim to the entire amount originally awarded.

Only after additional prompting by the court to come up with some portion attributable only to the counterclaim did the Trustees capitulate. They pointed to the fees they had been awarded in prosecuting a similar straightforward ERISA case and argued that those fees, $8500, be deducted as a fair benchmark of what it would have cost them to prosecute this litigation against an opponent who was unwilling to violate Rule 11. The court

agreed, but deducted not the $8500 eventually awarded (which reflected reasonableness-of-fee-and-time deductions), but the $11,584 that the Trustees had requested in that fee petition. So it reduced the original amount of the sanctions, $29,869, by $11,584, to arrive at $18,285. Moreover, the district court agreed with Curry's position that in our cautionary note we had determined that no additional fees could have been generated in response to the answer's sanctionable denials. The court estimated that one-third of the fees that were not attributable to the estimated figure of the Trustees' base prosecution costs were attributable to other nonrecoverable aspects of the case (i.e., litigating against the denials), and thus further reduced the award by $6095, arriving at $12,190. As for costs, the district court reduced the original $2306.69 requested by forty-one percent, since the $12,190 fee award represented forty-one percent of the original $29,869 requested for fees. So it added $945.74 in costs to the running total, bringing the sanction award to $13,135.74. Finally, the district court added an additional $6425 in attorney's fees generated in litigating the Rule 11 motion through remand, representing two-thirds of the total amount requested, $9637.50; the one-third reduction representing the amount of time on remand the Trustees had spent arguing that the sanctionable denials resulted in additional fees (an estimate based on the observation that approximately one-third of the Trustees' briefs addressed that argument).

Regrettably—but not surprisingly—the case is back before us. Curry argues that the district court's chosen methodology was an abuse of discretion and, for that matter, that had the district court conducted anything short of a mini-trial over each of the recorded entries, it would have likewise abused its discretion. In the alternative, since the Trustees refused to meet him on the line-item-entry battlefield, Curry argues they are in derelic-

tion of their duty to substantiate their fee request and thus entitled to no fees-as-sanctions award at all (or at least, only to the $344 he admits directly resulted from his sanctionable conduct). In addition, he asserts a number of objections to the reasonableness of the entire fee request itself: namely, that the hours submitted were excessive and that the rates were unreasonably high. Finally, he argues that the award should have been further reduced based upon numerous equitable principles: most notably, that the Trustees failed to mitigate their damages and that the district court did not properly take into account his ability to pay the fine assessed. Curry's remaining challenges have been considered by the court, are meritless, and warrant no discussion here.

## ANALYSIS

### I.

"A request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Despite this oft-quoted admonition, fee litigation has become a significant burden on the federal courts. As we have previously observed, fee litigation "can turn a simple civil case into two or even more cases—the case on the merits, the case for fees, the case for fees on appeal, the case for fees for proving fees, and so on ad infinitum, or at least ad nauseam." *Ustrak v. Fairman*, 851 F.2d 983, 987 (7th Cir. 1988). Given the burdens this litany of fee litigation imposes upon the courts, we have granted wide latitude to district courts in setting awards of attorney's fees, for "neither the stakes nor the interest in uniform determination are so great as to justify microscopic appellate scrutiny." *Id.* Generally, a district court will only abuse this discretion when no reasonable person could have taken the same view it adopted. *Bright v. Land O'Lakes, Inc.*, 844 F.2d 436, 442 (7th Cir. 1988).

The same holds true for awards of attorney's fees as Rule 11 sanctions. In general, the district court enjoys broad discretion in setting a sanction award that it believes will serve the deterrent purpose of Rule 11. In an effort to deter future conduct, it may impose a flat sanction, it may strike offensive pleadings, or—more commonly—it may direct the offending party to pay the other party's reasonable attorney's fees. In the latter case, "Rule 11 is not a fee-shifting statute in the sense that the loser pays." *Mars Steel Corp. v. Cont. Bank*, 880 F.2d 928, 932 (7th Cir. 1989). Instead, "Rule 11 ensures that each side really *does* bear the expenses of its own case—that the proponent of a position incurs the costs of investigating the facts and the law." *Id.*; *see also Johnson v. A.W. Chesterton*, 18 F.3d 1362, 1366 (7th Cir. 1994). But if the court determines that an award of attorney's fees will serve the deterrent purpose of Rule 11, it has an obligation to award only those fees which directly resulted from the sanctionable conduct. Fed. R. Civ. P. 11(c)(1)(A). This ensures that the proponent of a sanctionable position ultimately pays the costs resulting from it, serving a dual purpose of deterrence and restitution, while avoiding blanket fee-shifting, which would have the tendency to overcompensate the opponent and penalize the proponent.

In practice, this proves to be an inexact science. Essentially, the analysis is a matter of causation. This is apt since we have already analogized Rule 11 litigation to tort law, having opined that "it establishes a new form of negligence," where one owes a "duty to one's adversary to avoid needless legal costs and delay." *Mars*, 880 F.2d at 932 (citing *In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 (7th Cir. 1987) ("[T]he Rule speaks of 'reasonable' pre-filing inquiry, the language of tort law.") and *Hays v. Sony Corp.*, 847 F.2d 412, 418 (7th Cir. 1988) ("Rule 11 defines a new form of legal malpractice.")). Carrying the analogy further: once a violation of this duty has been established,

a claimant must still show how its damages resulted from that violation. As with tort law, there are easy cases and hard ones. If a plaintiff files a baseless single-count complaint, it is fairly simple for a district court deciding upon an award of attorney's fees as a Rule 11 sanction to determine which fees resulted from the plaintiff's conduct: they are those that the defendant spent answering the complaint and defending against it. This scenario is the slip-and-fall of Rule 11 cases. The task becomes more complicated with multicount complaints or multiple defenses intertwined around similar operative facts, some of which are sanctionable, some not. Think of these cases as complex toxic-tort litigation. But just as tort law has developed various mechanisms to allow innocent plaintiffs to recover from negligent defendants even if it is difficult, if not impossible, to prove that all of the plaintiff's injuries resulted from the defendant's conduct, so too has the law of fee litigation developed to address these more complex scenarios.

In deciding upon a fee award in a case where a plaintiff has only partially prevailed, a court must apportion the award according to the results actually achieved. *Hensley*, 461 U.S. at 434-37. Perhaps a victorious plaintiff will have succeeded on only some of his claims for relief, in which case the district court has an obligation to adjust the award downward to account for time spent on unsuccessful claims. In *Hensley*, the Supreme Court outlined the framework for the district court's analysis: "Factually unrelated claims are treated as separate lawsuits, and therefore if the plaintiff loses on such a claim he is not to be reimbursed for the attorney's fees allocable to it." *Ustrak*, 851 F.2d at 988 (discussing *Hensley*). In this scenario, a fee applicant should have maintained and provided records identifying "the general subject matter of his time expenditures," which will "enable a reviewing court to identify distinct claims." *See Hensley*, 461 U.S. at

437 & n. 12. "But where 'the plaintiff's claims of relief . . . involve a common core of facts or [are] based on related legal theories,' so that 'much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis, . . . the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" *Ustrak*, 851 F.2d at 988 (quoting *Hensley*, 461 U.S. at 435). If the latter is applicable, "[n]o exact calculation" of the time reasonably required to prepare and litigate a case if that case had been confined to its meritorious issues is possible. *Id.* at 989. The amount is an "elusive counterfactual," and thus relegated to the domain of best estimates. *Id.* (finding that the "best estimate" of the cost of prosecuting plaintiff's sole meritorious claim amid five other unsuccessful ones would have been "half as great as it turned out to be").

We see no reason why *Hensley* shouldn't control under Rule 11's directly resulting standard. For that matter neither do the parties. The more pressing question is where the relationship between the Trustees' bare prosecution costs and Curry's sanctionable conduct lies amid *Hensley*'s distinction between factually unrelated, independent claims and those claims interwoven around a common core of facts or based on related legal theories. A district court is less likely to abuse its discretion in deciding to "simply reduce the award to account for . . . limited success," rather than identifying and eliminating specific unrelated hours, in a case where the prevalence of common facts and related themes makes it difficult, if not impossible, efficiently and expediently to pursue the other alternative. *See Hensley*, 461 U.S. at 436-37 ("There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply re-

duce the award to account for the limited success. The [district] court necessarily has discretion in making this equitable judgment.").

Here, it cannot be said that the Trustees' claim and Krull Electric's counterclaim are "factually unrelated." They share a central issue of proof: During the relevant time period, was Krull Electric obligated under the CBA agreement to make contributions? To succeed on their claim, one of the elements that the Trustees had to prove was that Krull Electric was a signatory to the CBA[1]; conversely, in order for Krull Electric to succeed in its own right, it had to prove it was not. In its answer, Krull Electric first denied that it had any contributory obligations and then asserted this denial as an affirmative defense. It added as another affirmative defense that the Trustees' demand for payment without obligation was unlawful. These defenses comprised Krull Electric's counterclaim; only in pleading the counterclaim, Krull Electric was required to submit a short plain statement of the facts. Krull Electric alleged that Local 134 had repudiated Krull Electric's signatory status in October 1994 (no obligation) and that the Trustees' demand for payment violated the LMRA (unlawful). In addition to the October 1994 repudiation allegation, Krull Electric's trial brief presented a couple new factual twists about why Krull Electric was no longer bound by its earlier assent to the CBA. These alternate

---

[1] The Trustees' claim had the following elements: (1) the Trustees administer ERISA funds for Local 134 members; (2) Krull Electric was a signatory to Local 134's CBA, which required contributions to be made to the Trustees; (3) Krull Electric employed an individual who performed bargaining unit work; and (4) Krull Electric failed to remit fringe-benefit fund contributions to the Trustees. *See* 29 U.S.C. §§ 1132(a)(3), 1145 (2002); *Connors v. Hallmark & Son Coal*, 935 F.2d 336, 337-38 (D.C. Cir. 1991); 1 ROTHSTEIN ET AL., EMPLOYMENT LAW § 3.27 (2d ed. 2002).

theories could have provided support for Krull Electric's counterclaim, had Krull Electric been able to offer up any proof in support. It could not. It was this complete failure of proof, regardless of the theory advanced, that ultimately made the counterclaim sanctionable. Restated, if the counterclaim was supportable on any theory, it would not have been sanctionable. But regardless of whether it took the form of the initial October 1994 repudiation allegation or those later advanced, the Trustees had to refute the central allegation of the sanctionable counterclaim that Krull Electric was no longer obligated to contribute in order to succeed in prosecuting their case.

This is not to say that a blanket award of all attorney's fees incurred in the litigation was justified under Rule 11. Indeed, we remanded because it was not. But certainly this case was like those where recoverable claims are closely interwoven factually and legally with nonrecoverable ones. And we cannot say that given this interrelatedness, the district court abused its discretion in determining that an analysis of each line-item entry in the petition was overburdensome and unlikely to produce a reliable result. *See Tomazzoli v. Sheedy*, 804 F.2d 93, 98 (7th Cir. 1986) ("[I]t is generally unrealistic to expect a trial court to evaluate and rule on every entry in an application.").

Curry would reject this conclusion, arguing that a district court has an obligation to respond to specific objections raised in opposition to a fee petition. *See Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1196 (11th Cir. 2002). The Eleventh Circuit has observed that the "more specific the objections to a fee application are, the more specific the findings and reasons for rejecting those objections can be." *Id.* at 1196-97. Here, Curry asserted boilerplate objections to all but two entries in the fee petition. Essentially, they were comprised of one of two categories: either he objected to any entry that did not mention the counterclaim specifi-

cally, or he objected to line item entries that clearly referred to the counterclaim or motions written in opposition to it, but objected to them because they also included time he opined was dedicated to addressing other tasks. Curry would have a point if his sanctionable conduct and the Trustees' prosecution efforts were not—as demonstrated above—so factually and legally intertwined. Keeping this interrelatedness in mind, however, we find—as the district court must have—that Curry's boilerplate objections were unduly overbroad. The Trustees effectively demonstrated this point to the district court in their reply, where they showed how entries that did not reference the counterclaim on their face nonetheless reflected time spent in opposition to it (or at the least, time spent litigating the central issue in the case: whether or not Krull Electric was obligated under the CBA). Nonetheless, even if Curry's individual objections were nonspecific in the sense that they were fatally overbroad, the gist of them had some merit; on remand the district court was charged with the obligation to segregate the recoverable from the nonrecoverable. But Curry's concerns are addressed by the district court's decision to reduce the award; they are not offended by the court's refusal of Curry's invitation to do so on an entry-by-entry basis.

Curry next argues that the district court violated our mandate by simply reducing the fee award instead of deciding upon specific entries in the fee petition. Curry reads too much into our opinion. We remanded because we noted that the district court was in the best position to make the decision on fees, having had first-hand experience with the parties and the issues advanced throughout the litigation. Had we felt otherwise, we had the authority to review the petitions and make our own determination of an appropriate award. *See Ustrak*, 851 F.2d at 989-90 (listing cases where appellate courts made necessary adjustments to fee awards "without bothering

to remand"). In remanding, our cautionary notes merely reinforced the district court's obligation to segregate out those fees generated as a result of sanctionable conduct. They did not mandate that a particular methodology be employed to achieve that end.

## II.

We next address the application of the district court's chosen methodology. Under *Hensley,* the starting point in a district court's evaluation of a fee petition is a lode-star analysis; that is, a computation of the reasonable hours expended multiplied by a reasonable hourly rate. 461 U.S. at 434. Here, that figure was the $29,869 that the Trustees had requested in their initial post-trial fee petition submitted under ERISA's fee-shifting provision. The district court used this number as a base award from which to deduct nonrecoverable fees. Curry argues that the district court abused its discretion in using this figure as a starting point without first making reductions for unreasonable hours (vague time entries, multiple tasks in single entries, etc.) and unreasonably high hourly rates. But the district court had already rejected these same arguments in its March 27, 1998 order, in which it ruled that the hours spent and the rates charged were reasonable. Curry did not appeal this aspect of that ruling, and, as such, these arguments have been waived. *See Moriarty v. Svec*, 233 F.3d 955, 963-64 (7th Cir. 2000). In any event, since no circumstances have changed that would affect the district court's initial impression of the reasonableness of the total hours spent litigating the case or the hourly rates charged, we can see no abuse of discretion in the district court's refusal to readdress the issue on remand.

Curry also challenges the baseline figure by arguing that it still improperly included some amount of fees

generated before the filing of the sanctionable answer and counterclaim. Looking at the original fee request, Curry asserts that just over $4800 in fees included in the original petition was generated between October 1995 and May 10, 1996. We agree and will subtract $4800 from the court's baseline figure of $29,869. In so doing, we note that Curry receives a bit of a windfall from this deduction since the court's later subtraction for estimated prosecution costs, which was based on a bare ERISA claim taken from filing to judgment, would have by definition accounted for expenses incurred at the outset of the Trustees' claim; that is, between filing the complaint and receiving the sanctionable answer. But in the face of clear evidence—because the burdensome and inexact task of interrelated-claim segregation discussed above is not at issue for the time period before the sanctionable papers were even filed—we will make the deduction.[2]

Curry's main problem with the court's chosen methodology is its decision to use the fees incurred by the Trustees in another, unrelated ERISA case as a benchmark for what their fees would have been in this case had no sanctionable conduct occurred. Despite Curry's protestations, the approach itself is not novel. We have noted that district courts often look to fees awarded in similar litigation for guidance in fashioning appropriate awards. *See*, *e.g.*, *Tolentino v. Friedman*, 46 F.3d 645, 652 (7th Cir. 1995) (fees charged in other cases used as evidence of attorney's market rate); *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1315 (7th Cir. 1996) (same). Here, the district court looked to a recent ERISA case prosecuted by the Trustees against another signatory to the same

---

[2] We reiterate that we have the power to modify the judgment without remanding. *See Burda v. M. Excker Co.*, 2 F.3d 769, 778 (7th Cir. 1993); *Ustrak*, 851 F.2d at 989-90. We do so here in the interests of bringing this protracted litigation to a close.

CBA, *Divane v. Barnet Electric Co.*, No. 93 C 1721, 1995 WL 55245 (N.D. Ill. Feb. 7, 1995). An audit of Barnet Electric's payroll by the Trustees' accountant revealed inaccurately kept records for fiscal year 1988 and, as a result, showed the Trustees being owed some $29,000 in delinquent benefit-fund contributions. There was no dispute that Barnet Electric was a signatory to the CBA or that it was liable to make regular reports and corresponding benefit-fund contributions. Instead, the only issue presented for trial was whether the audit revealed unreported overtime hours or merely noncompensable reimbursements. *Barnet Electric* was a single issue ERISA case; at most, the kind of case that *Krull Electric II* should have been absent sanctionable denials and allegations that Krull Electric was no longer bound by the agreement.

Curry makes much of the fact that the same parties were simultaneously litigating *Krull Electric I* and that if the court was going to look to other cases, it should have looked to the Trustees' *Krull Electric I* fee petition (some $48,000). It is not clear whether this argument was ever presented to the district court, but even if it was, we don't find it persuasive. In making it, Curry fails to recognize that *Krull Electric II* should have been a very simple case because of the admissions obtained as a result of the *Krull Electric I* litigation. Almost by definition then, *Krull Electric I* was not analogous and must have been excluded from the court's comparison.

In the end, we could speculate a number of ways that the district court could have decided upon an estimate of base prosecution fees. For example, it could have looked to more than one case, and even to similar cases between other litigants, and averaged the results. But we cannot say that the approach it did take, given its knowledge of both the issues and the protracted procedural history of the instant case, was one that no other reasonable person in the same situation would have taken.

Continuing to follow the district court's analysis, if we deduct the $4800 from the baseline figure of $29,869 and then deduct the district court's $11,584 estimate of base prosecution fees, we arrive at $13,485. Having decided that we had ruled conclusively that no additional fees were generated as a result of Curry's sanctionable denials, the district court next estimated that one-third of this remaining amount (which is now $13,485) should be attributed to time spent litigating against the non-recoverable, though nonetheless sanctionable denials. Had the Trustees taken issue with this aspect of the district court's award and cross-appealed, they may have found sympathetic ears: although we note that in further reducing the amount the district court was only attempting to follow the cautionary statements in our first opinion, we see potential problems with its conclusion.

First, we observe that it is a very different thing to say "we see no reason" why the sanctionable denials would generate additional fees, *Divane I*, 200 F.3d at 1031, than to hold "there is no reason." The former connotes skepticism about a possibility; the latter forecloses it. *Accord Moriarty*, 233 F.3d at 964 ("Moriarty's first claim is that any reduction in the Phase I fees is prohibited by language in the first opinion of this court, which states that 'we see no error in any of the cost and fee calculations the [district] court has already ordered.' However, immediately preceding this phrase the opinion states that 'we realize that this award may have to be adjusted on remand to reflect any additional proceedings.' This language plainly demonstrates that we did not freeze the amount of the Phase I award but rather explicitly invited the district court to adjust it in accord with subsequent proceedings." (citations omitted)). Second, the Trustees did present evidence in their submissions on remand showing how the sanctionable denials resulted in additional attorney's fees. Krull Electric had argued at trial

that its *Krull Electric I* admissions were evidentiary, not judicial in nature. In other words, although they were admissible evidence, they were nonbinding, and Krull Electric was free to introduce evidence to refute them. The Trustees produced trial transcripts to show that the company proceeded to spend trial time introducing testimony to that effect, and that the Trustees were obligated to respond. Finally, the very fact that the court attributed some amount of fees to the task of litigating against the denials belies our prognostication that no amount of fees was generated in response to them. We doubt that this amount was substantial (another reason for rejecting the estimated one-third reduction); nevertheless, when the district court found that fees were generated in response to the sanctionable denials, the fees should have been awarded, not discounted. But since on appeal the Trustees assert no error with this portion of the district court's analysis, we will not decide whether there was one. Hence, we will reduce our adjusted figure ($13,485) by one-third ($4495), arriving at $8990.

Moving on to costs, the district court next computed a ratio of the amount of fees it was prepared to award against the amount originally requested and then apportioned costs accordingly. It was reasonable to expect that portion of the fees attributable to the sanctionable conduct would bear a relationship to the portion of the costs attributable to the same, and thus we see no error in this next step of the court's analysis. If we do the same, allowing for our adjustments, we calculate that thirty percent of the total costs should be awarded, or $692. Adding this amount to the $8990, we arrive at $9682.

The court then considered an award of fees and costs for the effort spent in remand proceedings. Rule 11 allows the court, in its discretion, to award to the prevailing party the reasonable attorney's fees and expenses incurred in presenting or opposing the Rule 11 motion. Fed. R. Civ.

P. 11(c)(1)(A). Curry never convincingly argues why the fees incurred on remand are noncompensable under the rule. At the end of the day, despite the fact that it took an appeal and additional proceedings on remand, the Trustees prevailed on their motion, proving that Curry violated the rule and securing an award of attorney's fees as a sanction. *Cf. Sullivan v. Hudson*, 490 U.S. 877, 889 (1989) (holding that a claimant could recover attorney's fees for work done in administrative proceedings after remand, where those proceedings were critical to vindication of the claimant's rights); *Weyant v. Okst*, 198 F.3d 311, 316-17 (2d Cir. 1999). Given the amount of paper Curry filed in opposition to the Trustees' efforts to secure the amount of the award on remand—including, for example, motions to reconsider, motions to amend motions, an amended motion to reconsider, numerous discovery requests and subpoenas, a motion to present a surreply and the surreply itself, and rescheduling motions—it is hardly surprising that the district court felt that the Trustees' efforts in successfully prosecuting their motion should not go unrewarded. Furthermore, we have reviewed the Trustees' fee petition for this period and find the hours expended (64.25) and the rates charged ($150 per hour) to be reasonable. And although for reasons similar to those discussed above we are skeptical of the district court's one-third reduction of this amount, we will not disturb this aspect of the award absent challenge. Adding two-thirds of the Trustees' expenses generated on remand ($6425) to our adjusted figure ($9682), we total $16,107.

## III.

Finally, we address Curry's remaining arguments attacking the district court's refusal to reduce the sanctions award further. Of these, the only challenges meriting

discussion are whether the Trustees' failed to mitigate their damages and whether the district court failed to consider Curry's financial situation.

"A party defending against a frivolous paper has a duty under Rule 11 to mitigate its legal fees and expenses by resolving frivolous issues quickly and efficiently." *Dubisky v. Owens*, 849 F.2d 1034, 1037 (7th Cir. 1988). Which is to say, "[c]ounsel must mitigate [his] damages by correlating his response, in terms of hours and funds expended, to the merit of the claims." *Id.* (quotations omitted). "Further, the court must consider to what extent a defending party's injury could have been avoided or was self-inflicted." *Id.* (citing *Thomas v. Capital Security Servs., Inc.*, 836 F.2d 866, 879 (5th Cir. 1988) (en banc)). "This entails an examination of the promptness and method of bringing the frivolous conduct to the attention of both the court and the opposing party." *Id.*

In *Dubisky*, we remanded a Rule 11 sanction award to the district court for redetermination in light of the defendant's failure to mitigate its damages incurred in responding to the plaintiff's complaint. The plaintiff's complaint inaccurately alleged diversity jurisdiction. Instead of informally bringing this error to the attention of plaintiff's counsel, the defendants filed an extensive motion to dismiss and moved for sanctions, all of which generated substantial fees. Finding the plaintiff's conduct sanctionable, the district court awarded as a sanction all the fees generated in preparing the motion to dismiss. We held this to be error. Litigants have a duty to use the least expensive alternative to alert the court and the offending party to a possible Rule 11 violation. An informal phone call or status conference would have alerted the plaintiff to his error and thus could have avoided litigation over the issue. If, however, after receiving informal notice of his error, the plaintiff chose to press his jurisdictional allegations then the defendant

would have been justified in filing its extensive motion. *Id.* at 1038.

Here, we all but considered and rejected Curry's mitigation argument three years ago. There, Curry argued that we should estop the Trustees' motion since it was not filed in a timely fashion. *Divane I*, 200 F.3d at 1027. We rejected Curry's argument noting that "[i]mmediately after Pamela Lee's testimony, when it became apparent to Trustees' counsel that the counterclaim lacked a factual basis, Trustees informed Krull Electric and Curry that they would file for sanctions if factual information to substantiate this claim did not emerge." *Id.* at 1028. Therefore, *Dubisky*'s informal-notice requirement was satisfied. Despite the warning, Curry never withdrew his counterclaim. Like the hypothetical situation we propounded in *Dubisky*, Curry's refusal justified the Trustees' further efforts to strike the counterclaim and move for sanctions. *Dubisky*, 849 F.2d at 1038. Although they served Krull Electric with a motion for sanctions in September 1996 and moved for sanctions on October 17, 1996, the court rejected the motion at that time noting that the counterclaim raised issues of fact that still had adequate time to be discovered. *Divane I*, 200 F.3d at 1028. For this reason, the Trustees waited until after trial to move again for sanctions. In the meantime, the Trustees still had to prove their case, and, as discussed at length above, necessarily had to refute the counterclaim allegations in doing so. Having had the advantage of this nearly year-and-a-half period of additional discovery during which he neither proved nor withdrew the sanctionable counterclaim, it is disingenuous for Curry now to fault the Trustees for the benefit accorded him by the district court.

It is also disingenuous for Curry to claim financial hardship. It appears to this Court that Curry's financial circumstances change to suit his litigation posture. When

arguing against a substantial sanction award, Curry claims he lacks significant assets and that a large award may force him into bankruptcy. But when defending against the Trustees' fraudulent-conveyance claim, initiated in the same district court and alleging that Curry unlawfully conveyed his residence from joint tenancy with his wife to tenancy in the entirety with his wife in an effort to avoid payment of the sanction award, Curry claims "[t]here is no evidence or indication that John Curry will be unable to pay any award, even one as high as $35,589.69." (R. 164, Curry's Mot. for Stay of Fraudulent Conveyance Claim at ¶ 3.) Reading these fraudulent-conveyance submissions, the district court took Curry at his word, "Mr. Curry's submissions have shown that he will have the ability to pay the amount of sanctions that will be ultimately awarded," (R. 206) and so will we.

IV.

Both parties have indicated that they wish this litigation to end. To ensure that it does, we direct the Trustees to submit to this court within fifteen days a statement of fees reasonably incurred on appeal. *Accord Ustrak*, 851 F.2d at 990. The Trustees as prevailing appellees achieving substantial success on appeal are entitled to these costs. Fed. R. App. P. 39(a)(2), (4); *Ustrak*, 851 F.2d at 990 ("But the fact that we have cut down the district court's fee award [by one third] does not in itself justify trimming the award for fees in this court, given [the plaintiff's] status as an appellee defending with substantial although not complete success a district court's judgment in his favor."). "[W]e can determine those fees ourselves; we need not require the district court to make the determination." *Ustrak* 851 F.2d at 990. Curry may of course submit specific objections to particular items of expense.

## CONCLUSION

In conclusion, the judgment of the district court is AFFIRMED as MODIFIED. Curry is ordered to pay $16,107 to the Trustees as a sanction for conduct in violation of Rule 11. Interest on the judgment shall accrue from September 5, 2001, the date that the sanction award on remand was set. *Kaiser Alum. & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990) ("Where the judgment on damages was not supported by the evidence, the damages have not been 'ascertained' in any meaningful way."); *Harris v. Chicago Great W. Ry.*, 197 F.2d 829 (7th Cir. 1952) (vacating and reducing a district court's award of reasonable attorney's fees from $500,000 to $350,000, directing the district court to enter judgment in conformity with mandate, and allowing interest to accrue only from the date of the revised judgment; "[N]either the amount due for fees nor the due date of the obligation was authoritatively defined until our decision. There will be a final valid judgment only when a new one shall have been entered in conformity with our mandate.").

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*