In the

# United States Court of Appeals
### For the Seventh Circuit

No. 08-1506

BRUCE P. GOLDEN, individually and as
Next Friend of Dale Michelle Golden,

*Plaintiff-Appellant,*

*v.*

HELEN SIGMAN & ASSOCIATES, LTD., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 0283—**Joan B. Gottschall**, *Judge.*

ARGUED SEPTEMBER 16, 2009—DECIDED JULY 2, 2010

Before CUDAHY, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* In 2004, Bruce Golden's wife
Jody Rosenbaum filed for divorce in Illinois state court.
The proceedings that followed were fraught with
hostility as the parties engaged in a bitter dispute over
division of assets and custody of Dale, their only child.
After a year of setbacks in state court, Golden filed a multi-

count federal lawsuit. He seems to have named anyone who advocated for Rosenbaum in state court as a defendant, including Nancy Thomas, Rosenbaum's friend and neighbor; Helen Sigman, the court-appointed representative for the child; Rosenbaum's counsel; and two of Rosenbaum's business associates.

The district court abstained with respect to Golden's claim that he owned certain copyrights, on the theory that the ownership of assets in general would be resolved in the state divorce proceedings; it granted defendants' motions to dismiss on all other counts. A couple of years later, the district court sanctioned Golden pursuant to FED. R. CIV. P. 11(b)(2), requiring him to pay defendants' attorneys' fees and expenses. Golden has now appealed, and we affirm.

## I

On January 18, 2005, Golden sued the defendants in federal court, raising claims under federal copyright law, 17 U.S.C. §§ 501 *et seq.*, civil RICO, 18 U.S.C. §§ 1962(c) and (d), and 42 U.S.C. § 1983, as well as a variety of state-law theories. Golden's allegations revolve around his stormy divorce. He is convinced that the defendants have acted in concert to damage his relationship with his daughter Dale, impugn his reputation, and destroy his financial well-being.

Golden's complaint alleges that Rosenbaum's attorneys at Nadler, Pritikin & Mirabelli, LLC (collectively "Nadler") wrote letters defaming him and sought to disrupt his

business relationships. He also accused Nadler, along with two of Rosenbaum's business associates, of deliberately infringing his copyright to a real estate listing system. Sigman, Golden asserts, maligned his reputation and abdicated her duty of neutrality by favoring Rosenbaum in the custody proceedings. Finally, he believes that Thomas violated his rights when, in an effort to assist Rosenbaum's claim for child custody, she called 911 to report (falsely, he says) that Golden had abused his daughter.

After Golden amended his complaint, the defendants filed motions to dismiss for failure to state a claim upon which relief may be granted. See FED. R. CIV. P. 12(b)(6). On November 1, 2005, the district court granted these motions with one exception: it stayed proceedings for Count I, which alleged copyright infringement. For that claim, the court decided to abstain and to stay the federal action pending the resolution of ongoing state proceedings. In dismissing Golden's civil RICO claim, the court concluded that he had not properly pleaded the requisite predicate acts and pattern of racketeering activity necessary to state a claim. Golden was not entitled to relief under § 1983, the court found, because Sigman had not acted under color of state law and she enjoyed absolute immunity from suit. As Golden's state-law claims were unrelated to the remaining copyright count, the district court relinquished supplemental jurisdiction over them.

A month later, Nadler filed a motion for Rule 11 sanctions. The magistrate judge issued a report on July 15, 2008,

recommending that Nadler's motion be granted. The following week, Sigman and Thomas jumped on the bandwagon and filed their own motions for sanctions; their motions were also endorsed by the magistrate judge. Concluding that many of Golden's positions were wholly devoid of legal support, the district court decided to impose sanctions against him pursuant to FED. R. CIV. P. 11(b)(2), in the form of attorneys' fees. But because the sanctions related only to certain parts of the complaint, the district court reviewed the defendants' billing records and ordered Golden to pay just the fees related to the offending claims. Soon thereafter, Golden settled with Nadler, which was voluntarily dismissed from the case. At that point, the district court granted Golden's motion for a final judgment under FED. R. CIV. P. 54(b). This timely appeal followed.

## II

Golden has abandoned his civil RICO theory on appeal and instead has concentrated on the district court's dismissal of his § 1983 claim against Sigman. This court reviews a dismissal pursuant to Rule 12(b)(6) *de novo*. *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009). In assessing whether the plaintiff has stated a valid claim for relief, we "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). The district court concluded that Golden's § 1983 claim against Sigman was a nonstarter

for two independent reasons: Sigman was not a state actor, and she was absolutely immune from suit. While Golden challenges this decision on appeal, in the district court he repeatedly said that his acceptance of "[the district court judge's] ruling without seeking further relief before her or elsewhere" should weigh against the imposition of sanctions. Sigman interprets Golden's words as a waiver of his argument against dismissal of his § 1983 claim. "[O]nce a position is announced" in district court, Sigman contends, "backpedaling on appeal cannot be allowed." *Miller v. Willow Creek Homes, Inc.*, 249 F.3d 629, 631 (7th Cir. 2001).

In our view, Golden's statement falls short of a waiver. See *United States v. Parker*, 469 F.3d 1074, 1079 (7th Cir. 2006). This court has found waiver only when an attorney has unambiguously taken a position irreconcilable with that presented on appeal. *Miller* illustrates the point well. There the court found that the appellants had waived their right to appeal by: (1) withdrawing a motion for reconsideration; (2) notifying the court that "[they were] not going to be appealing" summary judgment; and (3) requesting that any related claims be stricken from the amended complaint. See *Miller*, 249 F.3d at 631 (emphasizing appellants' "clear statements of their intent" to waive appeal). In contrast, by framing his statement in the past tense (he "accepted" the dismissal order), Golden did not explicitly forswear the possibility of an appeal. Furthermore, noting that the court dismissed his state-law claims for lack of supplemental jurisdiction, Golden points out that referring to "further relief . . . elsewhere" might allude to pursuing

these claims in state court. We are satisfied that he avoided waiver of appellate review.

Turning to the merits, we begin by observing that we recently held that child representatives in Illinois are entitled to absolute immunity. *Cooney v. Rossiter*, 583 F.3d 967, 970 (7th Cir. 2009) (analogizing child representatives to guardians *ad litem* and court-appointed experts). But *Cooney* left the door open a crack for some suits against representatives. Immunity extends, it acknowledged, only with respect to conduct that "occurred within the course of [a child representative's] court-appointed duties." *Id.* At the time Golden filed his lawsuit, Illinois law made child representatives responsible for acting as the child's attorney, pursuing investigations into the facts, and offering recommendations to the court. 750 ILCS 5/506(a)(3); *Cooney*, 583 F.3d at 969 (explaining that a "child's representative is a hybrid of a child's attorney, 750 ILCS 5/506(a)(1), and a child's guardian *ad litem*").

Golden asserts that he raised allegations in his complaint that Sigman engaged in misconduct that fell outside the scope of her statutorily defined role. He focuses on Sigman's allegedly false and misleading communications with the parties on matters related to the custody dispute. According to Golden, Sigman falsely told Dale that Golden was dangerous and misrepresented facts about the proceedings to Golden. Even assuming that this were true, however, Sigman was still carrying out her responsibilities as a child representative; those duties centrally include speaking with the relevant actors about the custody proceedings and investigating

the facts. *Id.* (concluding that child representative could not be sued based upon his conversations with a psychiatrist regarding the children in the custody dispute). In this limited capacity, her actions closely resemble those of a guardian *ad litem.* Thus, she functioned as an "arm[] of the court" and "deserve[s] protection from harassment by disappointed litigants, just as judges do." *Id.*

More problematic are Golden's allegations that relate to Sigman's acts as an advocate, such as her preparation of court orders and her efforts to eliminate the role of the court-appointed psychiatrist. Though these tasks are part and parcel of a child representative's statutory duties, they involve a form of advocacy that more closely resembles the work carried out by a public defender than that of a guardian *ad litem*. See *Gardner by Gardner v. Parson*, 874 F.2d 131, 145-46 & n.21 (3d Cir. 1989) (distinguishing guardian *ad litem*'s advocacy role from her reporting function). Since public defenders are not absolutely immune from suit, *Tower v. Glover*, 467 U.S. 914, 921-23 (1984), child representatives may not be protected when they function as a child's attorney. See *Parson*, 874 F.2d at 145-46 (adopting a functional approach to determining the scope of a guardian *ad litem*'s absolute immunity). As the court in *Cooney* did not confront allegations implicating a child representative's actions as an advocate, it did not have the opportunity to comment on this issue.

We, too, can lay it aside for another day, for a different reason. In our case, the *Rooker-Feldman* doctrine bars us from reviewing the question whether Sigman

violated Golden's rights when she acted as Dale's advocate. See *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923); *District of Columbia Ct. of App. v. Feldman*, 460 U.S. 462, 486 (1983). The doctrine prevents a party "complaining of an injury caused by [a] state-court judgment" from seeking redress in a lower federal court. See *Exxon Mobil Corp. v. Saudi Indus. Corp.*, 544 U.S. 280, 291-92 (2005). Although we recognize that the Supreme Court has warned against a broad reading of this doctrine, see *Lance v. Dennis*, 546 U.S. 459 (2006), our case does not present the risk of expansion that was present in *Lance.* There, the Court disapproved the use of *Rooker-Feldman* "where the party against whom the doctrine is invoked was not a party to the underlying state-court proceeding." 546 U.S. at 464. In our case, the parties are identical, and the only injury that Golden alleges that he has suffered from Sigman's supposedly biased advocacy is the alienation of Dale's affections and a reduction in his custodial rights. These harms flow directly from the fruit of Sigman's efforts: state-court custody orders favorable to Rosenbaum. Golden has not alleged a procedural harm that is separate and independent from the state court's custody determination. See, *e.g.*, *Nesses v. Shepard*, 68 F.3d 1003, 1005 (7th Cir. 1995) (explaining that plaintiff's claim that his state trial was tainted by politics was distinct from a claim that the state-court judgment was erroneous). As Golden's allegations cannot be separated from the state court's judgment, *Rooker-Feldman* acts as a jurisdictional bar. We add for the sake of completeness that even if some aspect of these orders escapes *Rooker-Feldman*, after *Lance,* we

would reject Golden's claims on the merits. The federal court would be obliged to give full faith and credit to the state-court judgment, see 28 U.S.C. § 1738, and we see no reason why Golden should be entitled to reopen matters that the state court actually resolved or could have resolved.

All that remains of Golden's complaint are a couple of allegations, neither of which has merit. Golden's conclusory claim that Sigman helped Rosenbaum violate court visitation orders lacks the factual specificity required to raise it above the speculative level. See *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Brooks v. Ross*, 578 F.3d 574, 581-82 (7th Cir. 2009). Similarly there is nothing to Golden's allegation that Sigman had Dale's school deny him access to Dale unless he was accompanied by a guard. Sigman only informed Dale's school that Golden's visitation rights had to be restricted after the state court had limited Golden to an hour a week of supervised visitation. Sigman's communications with the school, as a practical matter, added nothing to the state court's order, which as we already have explained cannot be re-examined.

Having determined that absolute immunity and *Rooker-Feldman* wipe out Golden's § 1983 claim, we conclude that the district court properly granted defendants' motion to dismiss. Thus, there is no reason to assess whether the district court was correct in ruling in the alternative that Sigman was not subject to suit under § 1983 because child representatives are not state actors.

**III**

Golden also takes issue with the district court's decision to impose Rule 11 sanctions and the methodology the court used in calculating its award of attorneys' fees. We review sanction rulings under Rule 11 for an abuse of discretion. See *Fabriko Acquisition Co. v. Prokos*, 536 F.3d 605, 610 (7th Cir. 2008). Golden objects to the timeliness of Sigman's and Thomas's motions for Rule 11 sanctions; he disputes the district court's decision to grant Rule 11 sanctions; and he takes issue with the amount of attorneys' fees awarded to Sigman and Thomas as recompense for his sanctionable conduct. We address each argument in turn.

Sigman and Thomas delayed filing their Rule 11 motions for approximately a year after they filed their motions to dismiss. Golden submits that this lassitude should have led to a dismissal of the request. Sigman and Thomas counter that Golden forfeited this argument by failing to raise the issue of timeliness until his motion to reconsider the district court's order granting Rule 11 sanctions. See *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1336 (7th Cir. 1992). We agree with Sigman and Thomas that Golden failed to preserve this line of argument. Nor is Golden's misstep excusable. The question is not a pure issue of law; rather it depends centrally on the facts, some of which are contestable. *Cf. Matter of Reese*, 91 F.3d 37, 39 (7th Cir. 1996) (acknowledging that forfeiture may be forgiven for pure legal questions). Moreover, it does not appear as though the district court ever addressed the timeliness of Sigman's

and Thomas's motions. *Cf. Alicia-Hernandez v. The Catholic Bishop of Chicago*, 320 F.3d 698, 701 (7th Cir. 2003) (concluding that party had not forfeited argument when the district court gave full consideration to the issue in question).

Even if Golden had not forfeited his timeliness challenge, the question whether to grant sanctions would have been one for the district court's discretion. The district court would not have been compelled to accept Golden's characterization of the delay as a full year. Indeed, that assertion turns out to be weak upon closer examination. In order to come up with a year, one needs to rely on the date when Golden's original complaint was filed, in January 2005. But he amended that complaint twice, adding claims against Thomas and altering the claims he had brought against Sigman. The district court would therefore have been well within its rights to look at the time between the date when the defendants filed their respective motions to dismiss (May 20, 2005, for Thomas and July 5, 2005, for Sigman) and the date of the Rule 11 motions. Viewed that way, it appears that Thomas waited only four months to serve her Rule 11 motion and 13 months to file it, while Sigman delayed service for just two months and filed 11 months later. Both Rule 11 motions were filed with the court well before the district court entered final judgment in 2008.

The district court did not abuse its discretion in tolerating this delay. Not only did Sigman and Thomas file their motions before final judgment, they both complied

with Rule 11's "safe-harbor provision" by serving Golden with their motions before the case was dismissed. See FED. R. CIV. P. 11(c)(2); *cf.* FED. R. CIV. P. 11 1993 Advisory Committee's Notes (tying the need to file Rule 11 motion before the conclusion of the case to respect for the safe-harbor provision). Golden had ample opportunity to withdraw his offending pleadings, as he was served more than a month before the district court dismissed the complaint. Moreover, Golden's claim of prejudicial delay rings hollow given that he had threatened earlier to seek sanctions against Sigman for her *premature* service of a Rule 11 motion.

Even if the motions were timely, Golden contends that the district court erred in granting Sigman's and Thomas's request for sanctions. The district court concluded that sanctions were warranted for everything in the complaint except the § 1983 claim against Sigman and two of the state-law claims against Thomas.

With regard to Golden's state-law claims against Sigman, the district court decided to impose sanctions because *Scheib v. Grant*, 22 F.3d 149, 157 (7th Cir. 1994), clearly granted Sigman absolute immunity under Illinois law. Golden argues that his failure to abide by *Scheib* should not be held against him as he did not uncover the case during the course of his reasonable pre-filing inquiry. Not surprisingly, the district court rejected the idea that poor legal research could amount to an excuse, pointing out that a simple natural language search of "absolute immunity" and "guardian *ad litem*" in Westlaw would immediately have uncovered the case. While

Golden might not be expected to have access to the judiciary's research tools, this does not excuse bringing a federal lawsuit in reliance on research tools unable to locate controlling precedent. The district court was on firm ground when it concluded that a reasonable search would have uncovered the *Schieb* decision, which had been out for eleven years at the time Golden filed his suit. See *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 933 (7th Cir. 1989) (*en banc*).

Nor do we have any trouble reconciling the district court's decision to impose sanctions for Golden's state-law claims with its conclusion that sanctions were not warranted for the § 1983 claim. With respect to the latter claim, the district court took into account the fact that this court had not yet, at that point, granted guardians *ad litem* absolute immunity from suit. This, too, was a reasonable call. Though *Scheib* suggested that Golden's suit was probably doomed, it dealt only with the doctrine of absolute immunity under Illinois state law.

Golden's state-law claims against Thomas, the district court explained, were sanctionable because well-established Illinois case law gave her absolute immunity from civil liability for making a 911 call. Approaching the matter from a different perspective, Golden objects that the district court should not have imposed sanctions after dismissing the state-law claims for lack of supplemental jurisdiction. But, as the Supreme Court explained in *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990), Rule 11 sanctions address a collateral issue; the violation is complete when the offending paper is filed, and the court

remains empowered to address the violation even after the action is dismissed. *Id.* at 395.

Closer to the merits, Golden argues that Thomas does not enjoy absolute immunity for making a false 911 call since it was recently made a crime to make such a call in Illinois. See 50 ILCS 750/15.2; 720 ILCS 5/26-1(a)(12); Chicago Municipal Code § 8-4-145. Before false 911 calls were criminalized, Illinois courts expansively interpreted absolute immunity to protect even statements made with malice. See *Vincent v. Williams*, 664 N.E.2d 650, 655 (Ill. App. Ct. 1996). He cites no Illinois authority, however, suggesting that Illinois courts would circumscribe the scope of the immunity from civil suit in light of the new criminal statute. Criminal sanctions can coexist peacefully with the absence of civil liability. In fact in this situation, Illinois courts might worry that eliminating immunity would open the doors to frivolous lawsuits, which would have a chilling effect on 911 calls.

Golden contends that his claims were not frivolous because, in his view, the Illinois and municipal statutes criminalizing false 911 calls created an implied private cause of action. See 50 ILCS 750/15.2; 720 ILCS 5/26-1(a)(12); Chicago Municipal Code § 8-4-145. Thomas counters that Golden forfeited this argument by making only a brief reference to it in his motion to reconsider the judge's order granting sanctions. See *Havoco*, 971 F.2d at 1336 (holding argument forfeited if raised for the first time in a motion to reconsider). We agree with Thomas that the point is too undeveloped to warrant attention here; in any event, we consider it unlikely

that Illinois would recognize an implied private action under these circumstances. See *Corgan v. Muehling*, 574 N.E.2d 602, 609 (Ill. 1991); see also *Tanya S. ex rel. Doe 1 v. N. Cent. Behavioral Health Sys., Inc.*, 816 N.E.2d 4, 7-8 (Ill. App. Ct. 2004).

Finally, Golden contests the manner in which the district court calculated the attorneys' fees and expenses it ordered Golden to pay. Since the district court sanctioned Golden for only some of the theories he advanced, it was required to apportion the attorneys' fees awarded so as to avoid penalizing Golden for others that fell above the Rule 11 bar. See *Divane v. Krull Elec. Co.*, 319 F.3d 307, 315 (7th Cir. 2003). This is not always an easy task. Thus, "where 'the [movant's] claims of relief . . . involve a common core of facts or [are] based on related legal theories,' so that 'much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis, . . . the district court should focus on the significance of the overall relief obtained by the [movant] in relation to the hours reasonably expended on the litigation.'" *Ustrak v. Fairman*, 851 F.2d 983, 988 (7th Cir. 1988) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)). Given the fact-intensive nature of this inquiry, district courts enjoy a great deal of discretion in formulating and applying a fee calculation methodology. *Ustrak*, 851 F.2d at 988.

In this case, the district court employed a simple "count-counting" methodology to compute the amount of attorneys' fees and expenses. Under this approach, it examined

the attorneys' billing statements and included hours billed for work related to sanctioned claims and excluded time spent defending against nonsanctioned counts. The remaining billing entries did not specify whether the work was devoted to sanctioned or nonsanctioned counts. For these fees, the district court divided the total dollar amount by the number of claims brought against an individual defendant and then multiplied the resulting figure by the number of counts for which Golden was sanctioned. In the end, the court ordered Golden to pay $16,060.23 to Sigman and $10,856.00 to Thomas.

Golden criticizes the district court's "count-counting" methodology on the grounds that it bore too weak a relation to the time records and resulted in an unreasonably large award—seven-eighths of the total bill—even though the six state-law claims were dismissed with little effort. The district court, however, was not compelled to accept Golden's evaluation of the records. For example, the court may have thought that Golden was exaggerating the ease with which the state-law claims were thrown out; Sigman devoted considerable attention in her filings to the question of absolute immunity and the *Rooker-Feldman* doctrine. It also could have reasonably rejected Golden's contention that the "count-counting" approach was improper because his claims did not revolve around a "common core of facts." *Id.* at 988. Viewed more generally, Golden's claims arose out of a related series of events arising out of Sigman's involvement with the child custody proceedings in state court.

Golden also argues that Sigman's counsel should not have received $3,095 for litigating the Rule 11 motion and the fee petition. In attacking the total spent on the Rule 11 motion, however, the most that Golden can show is that this court once found that $4,354 was too much for the preparation of a motion for sanctions. See *Budget Rent-A-Car System, Inc. v. Consolidated Equity LLC*, 428 F.3d 717, 718 (7th Cir. 2005). Nothing in the *Budget* opinion, however, was intended to set $4,354 as an outer limit for fees; these matters depend heavily on the particular circumstances of each case. The district court's decision here lay well within the bounds of its discretion, especially given the lengthy and often frivolous filings Golden submitted.

Switching over to Thomas's fee award, Golden contends that Thomas was awarded an unreasonably large amount of fees given that she allegedly responded to his state-law claims only with a few brief mentions of her immunity to suit. If that were so, he might have a point. But the record tells a different story. Thomas produced six substantive filings that discussed both immunity and claim-specific defenses. Golden also asserts that Thomas charged too much for litigating her Rule 11 motion and her fee petition: a total of $4,892.50. Assuming that Golden's calculation is correct, Thomas received only half of that amount ($2,446.25) under the district court's methodology. In addition, a large amount of Thomas's counsel's time was spent responding to Golden's numerous objections. As for the hours spent on the fee petition, the record reveals that Thomas's counsel billed five-and-a-half associate hours and a half an hour of partner time.

Applying the "count-counting" methodology, the district court awarded only three hours of fees. This is nothing like *Ustrak v. Fairman*, 851 F.2d 983, 987-88 (7th Cir. 1988), in which the court rejected the plaintiff's request for fees where the hours spent on the fee petition constituted a fourth of the total hours billed. Here, the number of attorney-hours associated with Thomas's fee petition amounted to only six percent of the total time billed. The district court was entitled to treat this as a reasonable charge. See, *e.g.*, *Kurowski v. Krajewski*, 848 F.2d 767, 777 (7th Cir. 1988).

Diving into the minutia of the billing records supplied by Sigman's and Thomas's attorneys, Golden also raises a host of minor quibbles with particular billing entries. As "neither the stakes nor the interest in uniform determination are so great as to justify microscopic appellate scrutiny" of attorneys' billing records, we see no value in explicitly addressing each of Golden's objections. *Ustrak*, 851 F.2d at 987. We have reviewed the record thoroughly and are satisfied that the district court's award of attorneys' fees accurately reflects the data contained in the billing records. We therefore uphold the district court's decision ordering Golden to pay $16,060.23 to Sigman and $10,856.00 to Thomas.

## IV

Both Sigman and Thomas have asked this court to impose sanctions on Golden for pursuing an appeal that clearly lacked merit. Federal Rule of Appellate Procedure 38 provides that a court of appeals may impose

sanctions for a frivolous appeal. We have held that an appeal qualifies as frivolous if either "the result is obvious" or "the appellant's argument is wholly without merit." *Wiese v. Community Bank of Cent. Wis.*, 552 F.3d 584, 591 (7th Cir. 2009). Although Golden raised a good number of frivolous points on appeal, he also drew this court's attention to a number of issues that could not be dismissed out of hand. While it is a closer call than it should be, we elect not to impose Rule 38 sanctions.

\* \* \*

We AFFIRM the judgment of the district court.